BERNARDO PONS, Plaintiff and Appellee, *v.* LUIS RIVERA SANTOS ET AL., Defendants and Appellants.

No. 12641.   Decided May 25, 1962.

504

*Hiram R. Cancio, Secretary of Justice, J. B. Fernández Badillo, Solicitor General, and Jorge Tomás Nido de Goenaga, counsel for the Department of Justice, for appellants. S. L. Lagarde Garcés for appellee.*

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

Bernardo Pons, a farmer engaged in the growing of coffee, brought an action against Luis Rivera Santos and Puro A. Camacho, the former, Secretary of Agriculture and Commerce, and the latter, Acting Director of the Coffee Insurance of Puerto Rico, on the date of the filing of the claim. Plaintiff claimed payment for coffee losses amounting to $14,500, which he allegedly suffered in 1956 in his farm "El Hoyo" in the ward of Jayuya Abajo of the Municipality of Jayuya, as a result of the hurricanes "Santa Clara" and "Greta" which occurred respectively, on August 12 and November 4 of that year, and in agreement with the application for renewal of the coffee insurance for the crop of 1956–57 and with the payment of the corresponding premium which he had made.

Defendants answered the complaint denying that the application for renewal of the coffee crop insurance was deposited in the post office of Utuado before 12:00 noon, or that they had acted without good cause or legal reason or in an illegal manner; likewise they denied that in similar cases they would have proceeded to grant insurance policies which covered the damages caused by the hurricane "Santa Clara" or "Betsy," and besides, for lack of information that other insurance companies of coffee crops and plantations paid losses in cases similar to that of plaintiff; they alleged, on the contrary, that the notification made by plaintiff was untimely, denying in turn that the losses amounted to $14,500, concluding with a prayer to the court to dismiss the complaint, imposing costs, expenses and attorney's fees to plaintiff.

The suit went to trial. Judgment was rendered in favor of the plaintiff granting him $12,250 for coffee losses, legal interest, costs, and $1,500 for attorney's fees.

The findings and conclusions on which the judgment was based are clear and precise. They cover all the points of fact and of law which have been discussed.

The findings of fact, which have not suffered a considerable challenge before us, are as follows:

"FINDINGS OF FACT.—That plaintiff Bernardo Pons sent on July 31, 1956 from Caracas, Venezuela, to his administrator, Arsenio Matos Pérez, a money order for the amount of the insurance premium for the coffee crop of his farm 'El Hoyo' and a letter in which he instructed him to insure only the crop. That Arsenio Matos received the letter and the money order on August 9, 1956, deposited the amount of the money order in the bank account of Antonia Pons, plaintiff's sister, on August 10, 1956 and the latter drew a check in favor of the Secretary of the Treasury on that same date to pay the amount of the insurance premium for the crop of the farm 'El Hoyo' belonging to Bernardo Pons, and verified the application for renewal of the crop insurance at 8:00 a.m. of the aforesaid day.

"That Arsenio Matos deposited in the post office of Utuado the application for renewal of the coffee crop insurance policy and the amount of the premium on August 10, 1956 between 11:30 a.m. and 12:00 noon, in an envelope addressed to the Department of Agriculture and Commerce—Coffee Insurance—Stop 19, Fernández Juncos Avenue—Santurce, Puerto Rico.

"That the mail of Utuado addressed to San Juan is collected only twice a day in the post office of Utuado: at 11:30 a.m. and in the afternoon at 5:00 p.m.; that this practice is not the same in all the post offices; that mail dispatch is ruled by internal regulations of each office and that in the towns where there is more mail it is collected and dispatched more frequently than in smaller towns. That all mail deposited in the post office of Utuado before 11:30 a.m., hour in which it is collected, and which is addressed to San Juan, is postmarked with a postmark with the hour of 12:00 noon. That all mail deposited in the post office of Utuado after 11:30 a.m. and between this hour and 12:00 noon, or after 12:00 noon and which is addressed to San Juan is postmarked with a postmark having the hour of 5:00 p.m.

"That the application for renewal of the policy and the amount of plaintiff's premium was received in the offices of the Coffee Insurance of Puerto Rico on August 13, 1956, and that a policy dated August 13, 1956 was extended to plaintiff Bernardo Pons, so as not to cover the losses caused by hurricane 'Santa Clara' or 'Betsy'.

"That the announcement of the atmospheric disturbance which occurred and which is known as hurricane 'Santa Clara' or 'Betsy' was made through the radio by the Federal Bureau of Meteorological Services on August 10, 1956, at 12:00 noon, that is, after the application for renewal of the coffee crop insurance and the check covering the payment of the premium was sent or deposited in the post office of Utuado by plaintiff's administrator.

"That plaintiff Bernardo Pons insured 300 hundredweights of hulled coffee at the rate of $50 per hundredweight.

"That the farm 'El Hoyo' was inspected by employees of the Department of Agriculture and Commerce under the Emergency Agricultural Rehabilitation Program in order to determine damages on the same due to the hurricane 'Santa Clara' or 'Betsy' and that these employees determined that the losses

in the crop was 50% of the total of same, which they estimated at 300 hundredweights therefore said crop losses amounted to 150 hundredweights.

"That in spite of having filed the declaration of post-hurricane losses on the date previously indicated, the office of the Coffee Insurance refused to pay the losses caused by the hurricane 'Santa Clara' or 'Betsy' in plaintiff's farm.

"That on November 4, 1956 Puerto Rico was hit by hurricane gales known by the name of 'Greta' and that the Coffee Insurance paid for the losses caused to many of the insured.

"That the coffee insurance refused to pay the losses caused by the hurricane gales named 'Greta' on plaintiff's farm and it alleged, to avoid payment, that the latter notified by telegraph on November 17, 1956 that he had suffered several losses, that is, after the term established by the Coffee Insurance Regulation to notify losses, which term had expired since November 14, 1956.

"That notwithstanding the fact that plaintiff did not notify the losses caused by the hurricane gales named 'Greta' within the ten (10) days following the disaster and that he did so three days later, that is, on November 17, 1956, the inspectors of losses of the Coffee Insurance could have determined them because they were able to inspect plaintiff's farm.

"That the inspectors of losses of the Coffee Insurance began the inspection of farms to determine losses due to hurricane 'Greta' after November 27, 1956, that is, eleven days or more after having received the telegraphic notification of several losses sent by plaintiff.

"That the failure to inspect plaintiff's farm was due to the interpretation of the scope of the regulation clauses made by the officials of the Coffee Insurance.

"That for hurricane 'Santa Clara' or 'Betsy' the Coffee Insurance admitted notifications of losses by letter or telegram and did not demand the post-hurricane declaration referred to, in the regulations.

"Plaintiff's delay in notifying his crop losses caused by 'Greta' did not cause defendants substantial damages of any kind and on the contrary, if the Coffee Insurance had wished to inspect the losses caused by 'Greta' on plaintiff's farm at the time in which it began to inspect the losses caused by 'Greta' in other farms, or before, it could have done so.

"That the Coffee Insurance of Puerto Rico did not have sufficient personnel to inspect the losses caused by 'Greta' until November 27, 1956, and that because of this it did not make farm inspections until after that date.

"That to David Matos, also a coffee grower, a policy was issued prior to the date in which his insurance application and the amount of the premium were received in the offices of the Coffee Insurance in the Department of Agriculture and Commerce of Puerto Rico and he was compensated for the losses caused by hurricane 'Santa Clara' or 'Betsy'.

"That plaintiff could only pick and gather from the whole crop 500 *almudes* of coffee, that is, 25 hundredweights, and that due to the hurricane gales named 'Greta', plaintiff lost 125 hundredweights of coffee from his crop.

"That all the coffee insurance transactions are made through the mail, since no offices exist in Puerto Rico, with the exception of the central offices of the Department of Agriculture and Commerce in Santurce, where the farmers may file their applications for policies and pay their premiums.

"It was stipulated by the parties, with the approval of the court, that from 1948 to 1953, inclusive, plaintiff insured with defendants the crop and plantations of his farm 'El Hoyo'. In 1954 he insured only the crop and in 1955 he insured the crop and plantations. In 1956, object of this claim, he only insured his coffee crop."

In their appeal from the judgment, defendants made the following assignments of error:

"The trial court erred:

"1) In determining that between plaintiff and the Coffee Insurance there existed an insurance contract which covered the losses occurred in the coffee crop caused by hurricane 'Santa Clara' and in granting compensation for said losses.

"2) In failing to apply to this claim the provisions of §§ 1213 and 1214 of the Civil Code, 1930 ed.

"3) In determining that plaintiff has a right to recover from the Coffee Insurance the amount of the losses suffered by reason of hurricane 'Greta' pursuant to the insurance policy which to those effects was in force.

"4) In holding that the Coffee Insurance would pay legal interest from the date of the occurrence of each one of the disasters.

"5) In admitting as evidence newspaper clippings using their contents to render judgment, when such matter is inadmissible hearsay evidence.

"6) In ordering the Coffee Insurance to pay attorney's fees."

With the exception of the fourth error, relative to the starting point in the computation of legal interest on the amount granted, none of the errors assigned was committed, and if they were, none was prejudicial.

I

Defendants-appellants jointly discuss the first two errors. They alleged that the Coffee Insurance was not obliged to pay farmer Pons for the losses suffered by him by reason of hurricane 'Santa Clara' for no insurance contract existed between him and the Coffee Insurance which covered them "in the light of the provisions of regulation and of law."

As revealed in the "History" which follows § 281 of title 5 of the Laws of Puerto Rico Annotated, the efforts of the government from the start of the present century until today for the better development and welfare of its coffee industry have been constant.

By Act No. 198 of March 26, 1946, a Coffee Industry Relief Commission was established. On that year Act No. 278 of April 5 created the Coffee Insurance Corporation. Its statement of motives is the following:

"Statement of Motives.—It is generally known that the coffee industry of Puerto Rico was the leading industry in this Island at the close of the nineteenth century, and one which gave the Island marked renown and prestige; and that a good part of our farm masses, as well as a large number of the growers engaged in the farming of this valuable bean, depended on this industry for their subsistence, and actually lived on it.

"Considering that several hurricanes and storms have swept over this island; recognizing that this danger continuously

threatens our coffee industry, a situation impossible to avoid due to the fact that the geographic position of this island exposes it during the hurricane seasons to these natural disasters; and having coffee agriculture declined in importance during the last few years due to this and other causes and events, our government, looking to the improvement of the coffee industry of Puerto Rico; in order to ensure therefor a more secure life and economic stability in all that concerns events of an unforeseen nature and impossible to avoid; and as a step in the search of a remedy for these evils that will forestall the total disappearance of coffee agriculture, deems it necessary and unavoidable, as a measure of considerable relief for coffee growers, to provide insurance for these coffee growers against the inevitable onslaughts of nature, such as hurricanes and storms, chief among the causes of the decline and fall suffered by our coffee industry."

The objective of the insurance was exposed in its § 2 as follows:

"The purpose and intent of the Coffee Insurance... shall be to provide *adequate insurance* to coffee growers against losses they may suffer through hurricanes, which purpose and intent the said Coffee Insurance of Puerto Rico may carry out either by engaging in the business of the said insurance or by obtaining such insurance from other underwriters, or in both ways. The Insurance... shall tend towards the safeguarding of its funds and resources, but such tendency *shall not operate in a manner likely to defeat the purpose and intent of the Coffee Insurance of Puerto Rico, as set forth in the preceding sentence."* (Italics ours.)

Act No. 67 of June 10, 1953 transferred the powers, faculties, and duties which corresponded to the Coffee Insurance Corporation to then Secretary of Agriculture and Commerce, and granted the latter "power to sue and be sued... and to prescribe rules and regulations." Said official approved on March 1, 1956 a "Regulation for the Insurance of Coffee Crops"—Defendant's Exhibit A—which Rule No. 2 provides, in part:

"... the applications may be filed during any period of the year.

"Upon receipt of the application, the Coffee Insurance may send an inspector to verify the data therein set forth. Once the application has been approved the Coffee Insurance shall issue the policy and as such it shall be considered for all purposes.

"Upon receipt of any official report from the Federal Bureau of Meteorological Services relating to the formation of an atmospheric disturbance in the Caribbean area, the Coffee Insurance shall immediately cease to give consideration to the applications whose envelopes had been postmarked by the Post Office after the hour in which the official announcement of the disturbance was made. Consideration of this shall be resumed once it is officially reported that the danger of a hurricane for the Island of Puerto Rico has disappeared.

"   .   .   .   .   .   .   .   .

"No insurance contract whatsoever shall exist between the Coffee Insurance and the applicant until the Coffee Insurance has approved the application which shall be notified to the applicant as soon as possible. The insurance policy shall be effective from the moment and under the condition in which the application is approved. Once approved the application shall form part of the insurance policy and as such it shall be considered for all purposes."

The effectiveness clause of this regulation provides the following:

"Rule 23
Effectiveness
"The provisions of this regulation may be applied to the insurance transactions performed by the Coffee Insurance of Puerto Rico *for the year 1956* as long as the aforesaid transactions are not in conflict with this regulation, *or, that the application of this regulation to the aforesaid transactions does not impair contractual rights.*" (Italics ours.)

The application for insurance renewal made in the name of farmer Bernardo Pons and the policy which was issued to him on August 13, 1956, were made using the printed forms prepared by the official himself. On the back of the policy

there appear printed under the title "General Conditions," twenty-four sections. In No. 20 it is stated "The Insurance reserves the right to change the type of the premium, value of coffee per hundredweights and provisions of this contract from year to year."

Appellants ask us to decide that since the Coffee Insurance did not approve Pons' application nor issued the policy before the hurricane "Santa Clara", he has no right to collect the losses which he sustained as a result of that hurricane because, besides the provisions of said regulation, we are bound to do so under § § 1213 and 1214 of our Civil Code.[1]

■ We are not considering a simple contract of civil or commercial insurance. Although it is a voluntary one, the coffee crop insurance involved in this litigation does not have its full origin in private contractual autonomy, but in an activity or public service of the State, within the scope of business, in its effort to promote the general public welfare by means of greater expansion, security and yield of its agricultural production.[2]

■ Some of the provisions on obligations and contracts of our Civil Code may be applicable to these insurances, in a suppletory way, provided their purposes and intents, as defined by the special law which established them, are not defeated. Section 1043, Civil Code. We have already seen

---

[1] These sections provide:

"Section 1213.—There is no contract unless the following requisites exist:

"1. The consent of the contracting parties.

"2. A definite object which may be the subject of the contract.

"3. The cause for the obligation which may be established.

"Section 1214.—Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract.

"An acceptance made by letter does not bind the person making the offer, but from the time it came to his knowledge. The contract in such case is presumed as executed at the place where the offer was made."

[2] Examples of other insurances created by our government are found in the laws for workmen's compensation for labor accidents, the one relative to payments to workmen of the sugar industry, the insurance for chauffeurs, and others.

in the Statement of Motives of the law which authorized the coffee insurance, that the latter had been conceived as a great stimulating measure to (1) promote the improvement of coffee agriculture; (2) insure a better existence and economic stability therefor, and (3) prevent its disappearance. Although that law provided that the Coffee Insurance should tend to safeguard its funds and resources, it also provided that "such tendency shall not operate in a manner likely to defeat the purpose and intent of the corporation." Section 2, as amended by Act No. 22 of July 1, 1947.

In the judicial determination of the existence and validity of the coffee insurance contract in question, a strict, legalistic or necessarily negative criterion should not prevail, but a liberal one, which will promote, not defeat, the legislative purposes and intent of the statute. There should be present, therefore, those adverse conditions of that almost unique agricultural activity, which struggles up in our mountain between realities of economic oppression, of personal sacrifices, of constant emigration of the rural working class to the urban zone, and of threats and scourges by cyclones and hurricanes. The resolution of every reasonable and founded doubt in favor of its existence and validity should be the rule.

We are concerned herein with the renewal of a coffee crop insurance contract. Pons had insured his crops in years prior to 1956. In order to request that renewal, the law does not fix any date. The regulation is the one which provides that the application may be filed "during any period of the year." Of course, every insurance contract should be executed before the damage or risk which is the object of the same has occurred, as a general rule, for if it has occurred and the person insured knows it, it lacks the uncertainty which is an essential element of the insurance contract. See the now repealed § 1697 of the Civil Code.

The trial court held, on uncontroverted evidence, that the application for renewal was subscribed and verified at eight o'clock in the morning of Friday, August 10, 1956, in Utuado, and that it was deposited in the post office of Utuado on this same day "between 11:30 a.m. and 12:00 noon" together with a check in favor of the Secretary of the Treasury for the total amount of the insurance premium, in an envelope addressed to the Department of Agriculture and Commerce, Coffee Insurance, Stop 19, Fernández Juncos Avenue, Santurce, Puerto Rico. See Plaintiff's Exhibits I, II and XIX, and the testimony of Víctor M. Barranco, pp. 13 to 16, stenog. C. Pérez, and of Arsenio Matos, pp. 84 to 86 of the same transcript of evidence. It also held that the announcement of the atmospheric disturbance which occurred and which is known as hurricane "Santa Clara" or "Betsy" was made at 12:00 noon of that day, Friday, August 10, 1956 "after the mailing or deposit in the post office of Utuado of the application for renewal of the coffee crop insurance and the check covering the payment of the premium," and also that notwithstanding the fact that the envelope was deposited during the morning, that envelope was postmarked in Utuado with a postmark indicating 5:00 p.m.

The hurricane occurred on Sunday, August 12. On the following day, Monday 13, the envelope containing the application for renewal and the check was received in the office of the Coffee Insurance, in Santurce. But the policy was issued on August 13, 1956 "so as not to cover the losses caused by the hurricane 'Santa Clara' or 'Betsy.' "

According to the trial court, to David Matos, another coffee grower of Utuado, whose application was issued on the same day, Friday, August 10 and received together with that of Bernardo Pons, on the same day, Monday, August 13 "a policy was issued dated prior to the day on which his

application was received . . . and he was compensated for the losses caused by the hurricane." [3]

Rule No. 2 only authorizes the suspension of the consideration of the applications whose envelopes had been postmarked by the post office after the hour in which the official announcement of the disturbance was made, and they shall be considered once it is officially announced that the danger of the hurricane has passed. The rule does not state that the issuance of the policy shall be denied in such cases where it appears that the application has been sent in an envelope postmarked after the announcement of the hurricane. It merely provides that in such a case the consideration of the application shall be suspended and shall be continued when the danger has passed.

■ According to the *Diccionario de la Real Academia Española*, 1956 ed., *"considerar"* (to consider) means: *"Pensar, meditar, reflexionar una cosa con atención y cuidado. Juzgar, estimar."* [*] As appellants themselves state, it is the act of studying the merits of each particular case and the risk involved in each contract.

They point out, at p. 7 of their brief, that "it seems evident that the postmark is used as evidence of good or bad faith on the part of the applicant of the insurance." If that statement is the expression of the criterion used by the Coffee Insurance to approve or deny the issuance of a policy—as it exclusively was in the case of Bernardo Pons—the purposes and intents of the law and the programs and services created thereby might be thwarted or defeated.

---

[3] It appears from the testimony of Puro A. Camacho, Assistant Director of the Coffee Insurance, that the hour postmarked on the envelope in which David Matos submitted his application could not be read; thus it was impossible to know whether it was mailed before or after 12:00 noon on August 10, and that under such conditions "there was a doubt to that respect, and it was determined that the benefit be given to the farmer." Stenog. C. Pérez, p. 41

[*] Our translation: "to consider" means "to think on with care, to ponder, reflect on something with attention and care; to estimate; calculate."

If "all the transactions of the coffee insurance are made through the mail, since no offices exist in the island" as the trial judge decided, the practice of postmarking is not the same in all post offices and the mail dispatch is governed by the internal regulations of each office, and if, specifically, in Utuado the mail is collected only twice a day, that is, at 11:30 a.m. and at 5:00 p.m., what reliable value as criterion of good faith can a postmark have the cancellation of which can not always indicate the exact time a letter was mailed in the mail box? None, in our opinion.

If *"considerar"* (to consider) is the act of studying the merits of each particular case, as appellants affirm, Bernardo Pons' application was never considered. If any attention and consideration should have been given it, it would have been readily seen that the application was verified at eight o'clock in the morning of Friday, August 10, before Víctor M. Barranco, public employee authorized to administer oaths for these applications, a resident of Utuado; that before noon of that same Friday it was deposited in the post office of Utuado by Arsenio Matos, a resident of Jayuya, and that the letter which is mailed in the letter box between 11:30 a.m. and 5:00 p.m. is always postmarked with the postmark of 5:00 p.m.

Why was a sort of investigation made respecting David Matos' application, which was received on the 13th, after the hurricane, and was then issued the policy retroactive to August 10 and the same was not made respecting Pons' application? See pp. 44 and 45, stenog. C. Pérez.

The application complied with all the requirements necessary to issue the policy,[4] that is why the policy was effectively issued, but to take effect from August 13, 1956, something which was not requested by the coffee grower, who was not even consulted to that effect.

---

[4] When Puro A. Camacho, Assistant Director of the Coffee Insurance was asked during the trial whether Pons' application "was a duly executed application," he answered: "Perfectly." Page 24, Stenog. Perocier.

The evidence introduced by appellants themselves showed that the practice of the Coffee Insurance was to consider the crop "automatically insured" after applying. That is what can be derived from the following part of the testimony of the above-mentioned Assistant Director Puro A. Camacho:

"Q. At any of those points in Puerto Rico is there any office of Agriculture and of the Coffee Insurance where the farmer may go to pay coffee insurance or did he have to send the application and the payment to San Juan by mail from the remotest hills of Puerto Rico?

"A. That is provided by the regulation.

"Q. I am asking you from where did it have to be sent?

"A. To San Juan.

"Q. I am also asking you if there was some agent at any point in Puerto Rico authorized to receive, to take care of the application and the policy, or did the farmer have to send it to San Juan?

"A. We do not have authorized agents. Let me explain. We do not have authorized persons because the regulation itself protects the farmer, since immediately after its application, at any point prior to any meteorological announcement, that application is considered automatically insured."

Pons' application complied with all the requirements to be considered "automatically insured." Rule 23 on the effectiveness of the regulation permitted the practice of automatic insurance to cover especially the farmers' applications for the year 1956, by providing that said regulation would not be applicable to the operations realized by the Coffee Insurance of Puerto Rico for the year 1956, if its application to the aforesaid transactions injured contractual rights.[5]

---

[5] After this suit had begun, that is, on April 30, 1957, the Secretary of Agriculture and Commerce approved the Regulation on the Insurance of Coffee Plantations and also another Regulation on the Insurance of Coffee Crops. In the former, and in its § 2, the clause was inserted that the contract did not exist until it was approved by the Coffee Insurance, but in the second regulation it was not inserted. See Rules and Regulations. Title 5, §§ 294-2 and 294-42.

■ The farmer who applies for insurance and pays the corresponding premium properly and timely has complied with his part in the formation, existence, and effectiveness of the insurance established by law. The determining factors of the effectiveness of his rights can not be invalidated by the negligent and careless consideration of his timely application. To apply to the case at bar the provisions of §§ 1213 and 1214 of the Civil Code would be, as the trial court so well stated, to destroy "the purposes and public policy which inspired the special law which created the Coffee Insurance." [6]

## II

The trial court, as we have seen, determined that on November 4, 1956 Puerto Rico was swept by hurricane gales known as "Greta" and that the Coffee Insurance paid for the losses caused to many insured; that plaintiff had coffee losses caused by the aforesaid gales amounting to 125 hundredweights and that the Coffee Insurance denied payment because plaintiff notified these losses on November 17, three days after the expiration of the ten-day term granted by the Regulation to do so. But it also decided that such delay did not cause substantial damages of any kind to the insurer because the latter "was not prepared with personnel to inspect the losses caused by 'Greta' until November 27, 1956."

■ Without any doubt the purposes and intents of the notification of losses within a specific period in every insurance transaction is to the effect that the insurer may promptly carry out the corresponding investigation respecting the causes of the disaster, and the nature and amount of damages or losses in order to prepare its defense.[7]

■ If the Coffee Insurance did not have any personnel until November 27 to inspect the farms stricken by "Greta",

---

[6] See *Brown* v. *Pilot Life Ins. Co.*, 194 S.E. 121 and *Phillips Roofing Co.* v. *Maryland Broadcasting Co.*, 40 A.2d 298.

[7] *Faulkner* v. *Nieves*, 76 P.R.R. 407, 411 (1954).

it was not harmed in any way by the fact that plaintiff notified the losses in his farm on November 17. In fact, even after the notice no inspection whatsoever was made on plaintiff's farm. In the afore-cited case of Faulkner, at p. 412, we stated:

"On the other hand, to escape liability, the insurer must show that insured's breach of agreement by defective notice results in substantial prejudice to the insurer."

██ The Coffee Insurance proved to have suffered no harm by receiving the notification on November 17.[8]

## III

The judgment appealed from ordered the Coffee Insurance to pay plaintiff $12,250, total amount of the losses suffered by the latter, "plus legal interest on and after the occurrence of each one of the above-mentioned disasters in the proper amount to be compensated...."

Appellants alleged that this pronouncement on interest is erroneous because it is contrary to § 8 of Act No. 104 of 1955, and because "the debt by way of the losses suffered is not an account stated at the moment of the disaster, since it had to be determined according to the inspections to be

---

[8] In the petition for review No. 47, *Luis Rivera Santos*, appellant, v. *Angel Mejía*, appellee, we had the opportunity to examine and study this issue. In this case the Coffee Insurance refused to pay the insured farmer the losses which he had sustained on account of "Greta" for having informed them a day after the reglamentary term of ten days. The trial judge rendered judgment ordering the Coffee Insurance to pay the losses and reached a decision similar to that in the case at bar, to the effect that the Coffee Insurance, within the ten days following the disaster, was not prepared nor able to immediately practice the corresponding investigation for the protection of its interests, for lack of personnel and organization. Reference was also made therein to the reluctance of the American courts to declare the rights of the insured forfeited or lost by the mere fact that its claims were filed without the term established in the policy to do so, when it is not shown that such delay was prejudicial to the insurer. Review of the judgment was requested on essentially the same grounds as those adduced in the case at bar on that point. We refused to grant the writ on November 14, 1958 for lack of merits and we denied the motion for reconsideration which was subsequently filed.

realized in order to determine the losses suffered and in the case at bar it was determined by the court."

The first ground is not valid. We are not concerned herein with a judgment against the State but against an entity known as the Coffee Insurance of Puerto Rico, created by law, with sufficient standing to sue and to be sued, whose powers and faculties "to engage in the business of insurance of crops and/or plantations of coffee against losses by hurricanes" including the capacity "to sue and be sued" and the right to "use the name or firm name 'Coffee Insurance of the Commonwealth of Puerto Rico' " were transferred to the Secretary of Agriculture and Commerce, now Secretary of Agriculture. 5 L.P.R.A. § § 290–309.

The second ground is meritorious. The obligation to pay the losses can not be considered an account stated from the date of the hurricanes. Plaintiff alleged in his complaint, among other things, that the Coffee Insurance had "refused to liquidate and pay the damages and losses caused to the coffee crop... ; has not begun the inspection or verification of facts" and alleged losses for $14,500. The trial court reduced them to $12,500, after having made the liquidation of those losses upon making its findings. The judgment should be modified for the purpose of fixing legal interest on the principal of the judgment as of the date thereof, namely, from January 24, 1958.

## IV

It is true that, as a general rule, newspaper articles or reports are not admissible as evidence of the facts narrated therein, for they constitute hearsay evidence. The trial court should have denied the admission of those introduced by plaintiff in view of the firm and reasonable opposition of defendants to their admission.[9] However, we

_____

[9] The headlines of these articles and their texts were not very flattering to the Secretary of Agriculture and Commerce, codefendant herein. Some of the first ones read as follows: "SUSPENSION OF APPLICATION

fail to find anything in the fundamental findings of the trial court which would show us that such articles decisively influenced the mind of the trier to reach his conclusions. What the trial court expressed respecting the public policy of the state concerning the coffee is supported by the Statement of Motives included in this opinion and by the language of the laws on the above-mentioned matters.

## V

■ Upon imposing attorney's fees the trial judge found that defendants-appellants had acted rashly. Nothing appears from the record which obliges us to alter that determination. The attorney's fees were not imposed upon the State. They were imposed upon defendants in their capacity as managers or administrators of an insurance business, the power having been granted to one of them, among others, to sue and be sued, and to use the name or firm name for those transactions.

■ The imposition of attorney's fees in the claims against the Coffee Insurance was authorized by § 7 of Act No. 67 of June 10, 1953, which became § 309 of Title 5 of the Laws of Puerto Rico Annotated.

The judgment appealed from will be modified only to the effect that it will provide that the interest on its principal will be paid from January 24, 1958 until the date of its total payment by the official or authority which by law should make that payment, and as thus modified, it will be affirmed.

FOR COFFEE INSURANCE, CREATES UNREST"; "GOVERNOR ORDERS ACCEPTANCE OF COFFEE INSURANCE. ACTION TAKEN BY RIVERA SANTOS IS THEREBY REVOKED," RIVERA SANTOS' TESTIMONY DISPLEASES LAWMAKERS AND COFFE GROWERS." Plaintiffs' Exhibits Nos. 21, 23, and 24.